# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Econo Lodge, Room 156, 120 East Seneca Rd,<br>Greensboro, NC 27406 | )<br>)<br>)<br>)<br>)<br>) |

Case No. 1:22MJ 382

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ Middle _____ District of _____ North Carolina _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §  641 | Theft of government property |
| 18 U.S.C. § 1752(a)(1)-(2) | Restricted building or grounds |
| 40 U.S.C. § 5104(e)(2)(D), (G) | Unlawful activities |

The application is based on these facts:

See Affidavit of Special Agent James Moran

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
/s/ James Moran
*Applicant's signature*

_____
James Moran, Special Agent (ATF)
*Printed name and title*

On this day, the applicant appeared before me via reliable electronic means, that is by telephone, was placed under oath, and attested to the contents of this Application for a search warrant in accordance with the requirements of Fed. R. Crim. P. 4.1.

Date: 09/27/22

_____
*Judge's signature*

City and state:  Greensboro, North Carolina

Honorable L. Patrick Auld, United States Magistrate Judge
*Printed name and title*

## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

IN THE MATTER OF THE SEARCH OF

**ECONO LODGE, ROOM 156,**
**120 EAST SENECA RD**
**GREENSBORO, NC 27406 ("PREMISES")**

SW No. _1 : 22mJ 382_

**UNDER RULE 41**

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
### FOR A WARRANT TO SEARCH AND SEIZE

I, James G Moran Jr, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules

of Criminal Procedure for a warrant to search the premises known as Econo Lodge, Room 156,

120 East Seneca Rd, Greensboro, NC 27406, hereinafter "PREMISES," further described in

Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been so employed since 2017. From 2017 to the present, I have been assigned to a unit at the

Washington Field Office that focuses on the investigation of healthcare crimes, including

healthcare fraud. I have also investigated other violent and non-violent criminal activity, to include

the execution of multiple search and arrest warrants.  As a federal agent, I am authorized to

investigate violations of laws of the United States, and as a law enforcement officer I am authorized

to execute warrants issued under the authority of the United States.

3. Currently, I am a tasked with investigating criminal activity in and around the Capitol grounds on January 6, 2021. As a Special Agent, I am authorized by law or by a government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of Federal criminal laws

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 641 (theft of government property); 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by Darrell Neely ("NEELY") and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject. There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

## PROBABLE CAUSE

### *Background – The U.S. Capitol on January 6, 2021*

6. The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol

2

Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

7.     At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

8.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

9.     On January 6, 2021, a joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the public.

10.     A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

3

11.     The joint session began at approximately 1:00 p.m. in the House Chamber.

12.     At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.  Also, around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.  Pipe bombs were later found near both the Democratic National Committee and Republican National Committee headquarters.

13.     As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence."  I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

14.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement.  The crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials.  At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured.  Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

4

15. At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.



16. Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As rioters attempted to break into the

House chamber, by breaking the windows on the chamber door, law enforcement was forced to draw their weapons to protect the victims sheltering inside.

17.     At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building. Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

18.     Also, at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

19.     At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

20.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.

6



21.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



22.     A subject left a note on the podium on the floor of the Senate Chamber.  This note, captured by the filming reporter, stated "It's Only A Matter of Time Justice is Coming."



8

23.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs.  Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





24.     At around 2:48 p.m., DC Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

25.     At about 3:25 p.m., law enforcement officers cleared the Senate floor.

26.     Between 3:25 and around 6:30 p.m., law enforcement was able to clear the U.S. Capitol of all of the subjects.

27.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day.  In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had

left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

28. Beginning around 8:00 p.m., the Senate resumed work on the Certification.

29. Beginning around 9:00 p.m., the House resumed work on the Certification.

30. Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. on January 7, 2021.

31. During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

32. Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

33. Many subjects seen on news footage in the area of the U.S. Capitol are using a cell phone in some capacity. It appears some subjects were recording the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S. Capitol itself, including photos of themselves damaging

11

and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

34.     Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:



---

[1] https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/





### *NEELY's Involvement at The Capitol*

36.     On January 9, 2021, the FBI received a tip that DARRELL NEELY entered the

U.S. Capitol building on January 6, 2021.  After receiving the tip, the FBI identified NEELY in

open-source video footage from the U.S. Capitol building on January 6, 2021.  Screenshots of the

open-source video footage are below, and NEELY is circled in red.  In the first image below,

NEELY is inside the U.S. Capitol building and appears to be holding a cigarette.  In the second

image below, NEELY is exiting the U.S. Capitol building and appears to be holding a cell phone.

 

37.     The FBI also identified NEELY in U.S. Capitol CCTV footage from inside the U.S.

Capitol building on January 6, 2021.  Screenshots of the CCTV footage are below.  NEELY is

circled in red.

14

 

38.     The FBI compared the above screenshots of NEELY with a photograph of NEELY obtained from law enforcement internal databases and determined that the screenshots above matched the photograph obtained from the law enforcement database.

39.     The FBI also interviewed three witnesses, Witness 1, Witness 2, and Witness 3, each of whom worked with NEELY at his radio station, Global Enlightenment Radio Network (GERN). Witnesses 1, 2, and 3 were all on two separate calls with NEELY on January 6, 2021. The first call occurred between approximately 2:45 p.m. and 4:00 p.m. The call began as a video call and seemingly became an audio call. The second call was a video call and began around 5:30 p.m. In addition, on January 6 and 7, 2021, Witnesses 1, 2, and 3, NEELY, and others participated in a group chat on a social media platform.

40.     Witness 1 stated that, on the first video call, NEELY went inside the U.S. Capitol building and narrated events happening inside the building. Although Witness 1 did not see NEELY inside the Capitol building, Witness 1 recognized NEELY's voice as he narrated from inside the building. Witness 1 stated that, on the second video call occurring after NEELY had

15

left U.S. Capitol grounds, NEELY displayed china plates and a jacket that he claimed was a U.S. Capitol Police jacket.

41.     While on the second call, Witness 1 also stated that NEELY displayed a black/dark-colored jacket with a silver badge on the left front and white lettering on the back and that NEELY claimed it was a U.S. Capitol Police jacket.  In addition, on the second call, Witness 1 saw NEELY display two china plates that were cream and maroon in color, with either a symbol or lettering in the center of each plate. Witness 1 thought NEELY insinuated that the items were taken from inside the Capitol building.

42.     Unlike Witness 1, Witness 2 stated the quality of NEELY's first video call deteriorated and that NEELY eventually lost service.  According to Witness 2, before the first video call ended, NEELY said the crowd was going inside the Capitol building and that he was going to follow the crowd.  Witness 2 also stated, on the second video call later in the day, that NEELY mentioned he had acquired a jacket as a souvenir.  In addition, Witness 2 participated in the January 6 and 7, 2021, group chat on Facebook Messenger with NEELY and others.   On January 7, 2021, in the Facebook Messenger group chat, NEELY sent, and Witness 2 viewed, a photo of china plates, off-white to tan in color, with an eagle in the center.  Based on the communications from NEELY that day, Witness 2 believed NEELY was claiming to have stolen the china plates while in the U.S. Capitol building.  Witness 2 did not observe a photo of the jacket.

43.     Witness 3 was also on both video calls on January 6, 2021.  According to Witness 3, while on the video call, NEELY said he was going inside the U.S. Capitol building.  Witness 3 saw NEELY during the evening of January 6, 2021, and, at that time, NEELY was in possession of four china plates and a USCP jacket, badge, name tag, and baseball cap.  According to Witness

16

3, NEELY boasted that he had attacked a USCP officer and had taken these items from the officer. Witness 3 said NEELY also boasted about taking the china plates from the Capitol building. According to Witness 3, NEELY continued to boast about taking these items during the second call in the evening of January 6, 2021.

44.     In the following days, NEELY broadcast about the events on his YouTube channel. The FBI has viewed several of these broadcasts. In one of the video broadcasts, NEELY was wearing a U.S. Capitol Police baseball cap. A screenshot of NEELY wearing the U.S. Capitol Police baseball cap is below.



45.     The FBI subsequently interviewed the USCP officer to whom these items belonged (Officer 1). Officer 1 stated that he/she removed these items from his/her person during decontamination from lacrimal spray and, thereafter, could not locate these items.

46.     According to Witness 3, NEELY left some of the above-mentioned items at the residence of Witness 3 until February 3, 2021, when he returned to collect belongings he had left at the residence.

47.     In addition, your affiant and one other FBI special agent interviewed NEELY on three separate occasions, including a post-arrest interview. During the interviews, NEELY stated

he went to the Capitol to film the events because he felt the events were newsworthy. He also admitted to entering the U.S. Capitol building. NEELY showed the interviewing agents several videos on his cell phone that he had taken during the events. NEELY allowed the agents to take photographs of the video. One such photograph is below.



48.     NEELY took photographs while he was inside the Capitol, and he sent these photographs to the FBI. One of the images, a picture that NEELY took of himself on Capitol grounds, is copied below.



49.    After these interviews, your affiant again reviewed the above images from open-source video and CCTV footage.  Based on my observations of NEELY during the in-person interviews, I have determined that NEELY is the individual circled in red in these photos.

50.    The FBI also reviewed cellular tower records.  NEELY provided his phone number, ending -3984, to the interviewing agents.  The AT&T cellular telephone number, ending -3984, was cross-referenced against cellular tower records that were obtained by the FBI via a search warrant served on AT&T for January 6, 2021.  In and around the time of the incident, the cellular telephone associated with NEELY's phone number ending -3984 was identified as having utilized a cell site consistent with providing service to a geographic area that included the interior of the U.S. Capitol Building.

19

*Probable Cause for PREMISES*

51.     On October 18, 2021, NEELY was arrested by the FBI, pursuant to an arrest warrant issued by the U.S. District Court for the District of Columbia on charges related to his involvement in the January 6 attack on the Capitol. NEELY was advised of his Miranda rights, which he then waived. Your affiant and another agent interviewed NEELY. During that interview, NEELY stated he took items from the Capitol, to include a Capitol Police Officer's jacket, baseball cap, and "Capitol Police" patch. NEELY stated he discarded all items but the patch, which he chose to keep as a souvenir, and that the patch was located in his room at his mother's residence. While in the interview, NEELY called his mother and instructed her to allow FBI agents to search his room there. The agents did not find the patch during the search. Your affiant informed NEELY that if he found the patch in the future, he needed to turn that over to your affiant, to which he agreed.

52.     On or about December 7, 2021, NEELY's mother's house suffered an accidental fire and was no longer habitable. Subsequently, the property was sold.

53.     On September 2, 2022, your affiant interviewed an individual that lived with NEELY in Greensboro, North Carolina, hereinafter referred to as "Witness 4." Witness 4 stated that NEELY, NEELY's mother, and NEELY's aunt lived with Witness 4 for several weeks in or around July and August 2022. In late August 2022, Witness 4 confronted NEELY and told them to leave the apartment permanently. After NEELY left, Witness 4 went through the items NEELY and his family members left in the apartment. Witness 4 found the aforementioned patch; below is a picture of the patch Witness 4 sent to your affiant. On September 9, 2022, Witness 4 turned over the patch to the FBI in Greensboro.

20



54. On September 8, 2022, your affiant interviewed an individual that lived with NEELY in Laurel, MD, hereinafter referred to as "Witness 5." Witness 5 stated that NEELY lived with Witness 5 from February 2021 to June 2022. According to Witness 5, following the fire at NEELY's mother's house in December 2021, NEELY moved all his items that he could salvage from the house into the apartment of Witness 5. NEELY moved his mother and aunt into a hotel for approximately a month, and then they, along with all their belongings, moved into the apartment of Witness 5 in or around January 2022. Many of the items belonging to NEELY and his family were stored in boxes or trash bags. In June 2022, Witness 5 confronted NEELY and told them to leave the apartment permanently. NEELY moved out all the items that were brought to the apartment of Witness 5 by NEELY, NEELY's mother, and NEELY's aunt.

55. On September 13 and September 21, 2022, NEELY failed to appear for status hearings in the U.S. District Court for the District of Columbia. On September 21, 2022, a bench warrant was issued for NEELY's arrest.

56.     On or about September 21, 2022, your affiant viewed a Twitter account belonging to user "@dfneely" ("Twitter Account 1"). Your affiant viewed numerous pictures of NEELY on the Twitter page. Additionally, NEELY's first two initials are "df." Based on the above, this Twitter account likely belongs to NEELY.

57.     When affiant your affiant viewed Twitter Account 1, he viewed the following Twitter posts from September 21 and September 13, respectively:



September 21, 2022                    September 13, 2022

58.     The first picture is a picture of a Capitol Police baseball cap, similar to the cap NEELY is wearing in the above picture excerpted from his broadcast, that was for sale on an independent website. In the other screenshot, it appears that NEELY is taunting the FBI and states,

"But I guess the FBI is more worried about some dummy who lost (and then abandon) their little hat." In this statement, NEELY is likely referring to himself as he is aware of the FBI's investigation into his actions, to include alleged theft of a baseball cap amongst other items, at the Capitol on January 6, 2021. Based on the timing of the posts, as well as knowledge of the investigation, your affiant believes NEELY likely still possesses a stolen Capitol Police baseball cap.

59.     I know, based on my training and experience, that people routinely re-wear clothing and accessories and store these items in their homes. Clothing and accessories consistent with those worn by NEELY on January 6, 2021, constitute evidence of the commission of the offenses discussed herein, in that NEELY can be visually identified as the individual in the photos and videos discussed above, in part through the distinct attire and accessories worn that day.

60.     Based on NEELY's lack of a permanent residence or storage since December 2021, any evidence of NEELY's alleged criminal activity at the Capitol on January 6, 2021, would be with him at any premises in which he currently resides.

61.     On or about September 10, 2022, NEELY was detained and cited by Greensboro, North Carolina Police Department in relation to a vehicle accident. When asked by Greensboro Police for his address, NEELY stated it was Econo Lodge, Room 156, 120 East Seneca Rd, Greensboro, NC 27406 ("PREMISES").

62.     On or about September 25, 2022, NEELY was arrested by Greensboro, North Carolina Police Department based on unrelated criminal charges. When asked by Greensboro Police for his address, NEELY stated it was PREMISES. Members of the Greensboro Police

Department spoke with the manager of the Econo Lodge, and the manager stated the room was registered to NEELY's mother.

63.     Based on the information above, NEELY has likely been residing at PREMISES since at least September 10, 2022.

## **CONCLUSION**

64.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

/s/ James G. Moran _by cop_

JAMES G. MORAN, JR.
Special Agent
Federal Bureau of Investigation

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on September 27,
2022.

L. PATRICK AULD
United States Magistrate Judge

25

## <u>ATTACHMENT A</u>

*Property to be searched*

The property to be searched is **Econo Lodge, Room 156, 120 East Seneca Rd, Greensboro, NC 27406** (the "PREMISES"), further described as a hotel room.

26

## ATTACHMENT B

*Property to be seized*

1.    The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. § 641 (theft of government property); 1752(a)(1) and (2) (unlawful entry on restricted buildings or grounds); and Title 40 U.S.C. Section 5104(e)(2) (violent entry, disorderly conduct, and other offenses on capitol grounds) (the "Target Offenses") that have been committed by Darrell Neely ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including,

    a.    Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

    b.    Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021, to include: china plates, a Capitol Police Jacket, badge, ballcap, and name tag; and

    c.    Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same.